Good morning. All rise. State of the Royal Appellate Court, First Division is now in session. Honorable Justice Shelby A. Harris presiding. Thank you. Please be seated. Will the attorneys who are going to orally argue please come up to the podium and introduce yourselves. Those attorneys that are going to argue, and who's the attorney for the appellant? That would be myself, Mark Almanza, on behalf of Angela Bennett. Thank you. And for the appellee? Assistant State's Attorney, Tasha Marie Kelly. Okay, good morning and welcome to our court. The microphone in front of you, attorneys, is not a public address system. It's there solely for purposes of recording. So if you want to make sure that everyone in the room hears you, especially the panel, I suggest you keep your voice up. If you talk loudly, you will not offend anyone. Okay, I'm going to allow 20 minutes for each side. The appellant, you'll have to reserve from that 20 minute period whatever time you would like for your response. Okay, we'll begin with the attorney for the appellant. Thank you. I would like to reserve five minutes for rebuttal. Proceed. Good morning, Your Honors, and may it please the court. In this case, Andrew, the entire instance lasted approximately 15 minutes. And then in those final seconds or moments after the confrontation with Mr. Jones and Mr. Bennett ended, that is essentially the crux of what we are deciding upon in this case. To lay out the time frame very briefly, Mr. Bennett was involved in a car accident. And a few minutes later, after they exited the vehicle, he proceeded to leave the scene. A few minutes after that, approximately five minutes after he had turned down a street into an industrial park off of the main road and then made another turn down another stretch of the industrial park on Goose Island, about five minutes after that happened is when Mr. Jones showed up. About five minutes after that is when the entire incident occurred. And it was seconds after that that the shooting did occur. It is our contention that during this entire time, Mr. Bennett was in fear, apprehensive of the situation, and at the final moments was acting in self-defense. What was he fearful of when he left the scene the first time? So when he left the scene the first time, the record indicates that he wanted to leave the scene because he had a gun in his car. So he wanted to not have that present during any further altercation or any further incident because he believed that the police were going to be called. Wasn't the gun that was thrown under the other car? Yes, it was disposed of. But that was before the fight ensued afterwards. So at that point he wasn't fearful of the deceased? No, he was. What was causing him to be fearful of the deceased at that time? The fear was there at the moment that Mr. Jones arrived. As I explained, and the record reflected, that it was an industrial area. It was not in the vicinity of the main thoroughfare where Mr. Jones came to life. These individuals did not know each other? No, this was the first time they had ever encountered each other. So we have a collision about 2 o'clock in the morning between these individuals, a motor vehicle collision? Correct. Right? Correct. So there was a collision and it was after Mr. Bennett left that scene. It was on Groose Island that Mr. Jones showed up and that's when the physical altercation became violent. At that point, Mr. Bennett had not exhibited any aggression or any violence or even burnished a weapon at any time. When Mr. Jones arrived, proceeded to pin Mr. Bennett along the vehicle and proceeded to attack him with a metal object, which caused severe damage and wounds to Mr. Bennett. Is it clear in the record what that object is? Is it keys? Is it a knife? What is that object? So the record doesn't make it clear as to what it was. It was metal. It was a metallic object. It's referenced as possibly keys and a knife handle was the cover that was covered in blood by Mr. Bennett. It's not clear in the record. I just don't think it was. It's one of those two things. Correct. So at the point that Mr. Jones was attacking Mr. Bennett, at that moment when Angela was able to flee and escape, only seconds according to Ms. Barras and a moment according to Mr. Elias, the two witnesses, that's how long they said the time elapsed from the moment that he escaped until the moment the shots rang out. It was a very, very quick turn of events. And who pulled that trigger? That was Mr. Bennett. What about the shots? What do you think is the relevance of the shots after that your client denied the shot into the car of Ms. Barras? So the record is unclear as to exactly how many shots were fired on Ms. Barras. She was shot by a bullet that came through the window of the car. Right. And it hit her in the rear, in her back. Right. That was her testimony that the shot came through the passenger side window. Mr. Elias testified that it came through the driver's side window. Mr. Elias testified as to two shots and so did Mr. Bennett. So there's questions as to how many shots were actually taken. That's not made clear in the record. But Mr. Elias was quite clear that she was shot at as well as the decedent, correct? I mean, that is clear in his testimony that Ms. Barras was shot at. That is Mr. Elias' testimony. Right. That is. And I'm saying what is the relevance of that vis-à-vis your client's alleged unreasonable or reasonable belief that he was acting in self-defense? How does that, in your mind, fit into that? So there are a couple of ways that that could fit in. The first prong would be on the self-defense. And it would be essentially the confrontation that occurred when Mr. Jones was beating upon Mr. Bennett, when Ms. Barras then engaged and interacted and became a participant in that attack. And so if that is one method of interpreting it as to how to fall under self-defense, putting Mr. Jones and Ms. Barras together as both attacking, alternatively it would be in the sense of the provocation on the second-degree murder reduction as it relates to Ms. Barras. During this entire incident, what were the actions taken by Jones against Bennett that you could describe as deadly force? So there is threats of the size of Mr. Bennett, significantly larger. Yes, he was a big man, 400 pounds at least. And so what actions did he take against the defendant that we could describe as deadly force? So at the point where Mr. Jones pinned Angelo against the vehicle and then proceeded to shake him about his face and body multiple times with a metallic object, which was believed to be the knife that was discovered. So the case says, this case says that an object is not necessary. In this case there was a metallic object that was used against Mr. Bennett. Additionally, the size of Mr. Jones alone would have been sufficient to constitute the danger of harm towards Mr. Bennett without any object or without any weapon. It was 420 pounds. Correct. So that alone would have been sufficient. But in this case we do have the additional metallic object that was used to harm Angelo. And it's clear in the record, every witness testified and was able to see that Mr. Bennett was wounded, was bleeding profusely at that time when this happened. Mr. Bennett, Mr. Barras was the shooter of Ms. Bites, correct? The lady in the car. What was her name? Kathy Bites. Kathy Bites. He shot her. Correct? Yes. Was any of her actions during this incident, were any of the actions of Ms. Bites during this incident actions that could be correctly described as deadly force? So Ms. Bites acting alone was not deadly force, applying deadly force towards Mr. Bennett. In conjunction with Mr. Jones, when Mr. Jones was beating upon Mr. Bennett, Ms. Bites entered that confrontation voluntarily herself. The testimony that she was putting her hands in his pockets and searching through. Well, that's sort of a different thing. That she would rifle people's pockets. That she would go through people's pockets. She was doing it while they were all together. She'd reach into people's pockets and see what she could get. So she was doing that. And at this time it would be minutes. That was well before she was shot. It was minutes. The entire confrontation from the point where Mr. Jones walked towards Mr. Bennett, it's somewhere between two to five minutes that that entire interaction happened. I'm sorry, I missed the last part. It was what? Two to five minutes from the point that Mr. Jones was beating upon Mr. Bennett until he was able to escape for moments. For a moment, yes. Correct. And then returned. Correct. With what? With a weapon. Okay. If I may explore that just for a moment upon his return. So the reason I was referring to the industrial park and area that he had turned off of would just further demonstrate the reasonableness of Mr. Bennett's fear. He was in an unoccupied area. It didn't seem that there was any other vehicle traffic. The officers that were testifying said they measured an industrial lot area as to how far they investigated. His vehicle was damaged. It was parked off to the side. He was sitting out of the vehicle, and the Maserati had pulled up next to the vehicle when Mr. Jones approached Mr. Bennett. So there was very little, even if the law doesn't require Mr. Bennett to leave, but even if he would have attempted to, there would have been very little recourses to where to flee. So they both got out of the cars and spoke to each other. They did at the initial point of impact, the car's first impact. That's right. So she was still sitting in the passenger side of the vehicle. Correct. She was sitting in the vehicle when they first made contact, and then when they arrived at the other location on Goose Island, everybody was out of the vehicle. And so it would be, or it is a situation then that essentially we're asking for Mr. Bennett to have understood what Ms. Bias was doing when she was moving her hands all throughout his pockets. All that Mr. Bennett was aware of at that time was that Mr. Jones was beating upon his head. So it's unclear. That's not pockets. Beating on the head was with the metal object. Correct. But this all happened simultaneously. And so essentially it would be asking for Mr. Bennett to have understood the differences to what was happening at that time. It was a matter of seconds or moments from when the interaction, when Mr. Bennett was able to flee. It's characterized in several times that Mr. Jones just was holding on and apparently let go. That's not the testimony that was given by Mr. Elias or Mr. Bennett, that he escaped and then was able to return. So this entire incident from Mr. Bennett when he was free of Mr. Jones's grip was only seconds before the shootings happened. Well, at this particular moment, as I understand from the record, the Marine, the military passenger, he tried to count things down. He tried to break them up. He did a count to five or something. His testimony that he counted down, I'll break it up, one, two, and that did break them up. So that is the testimony and that is at the time that the incident or that Mr. Bennett broke away. I would disagree with the characterization of that. He broke away and then Bennett runs for the gun, comes back, and the shooting ensues. Right. And so it was also clear that Mr. Everson... So wasn't there a pause then? Wasn't there a time for passions to subside? Possibly, but not in this case. He took two shots at this fellow's face. That's not – those are moments in time. It isn't collapsed into one specific thing. Understood. There is time that has elapsed. But if we look at when Mr. Efrain Elias was stating that he was trying to break up the incident, it was at the moment it began. So he had been standing on the side of the road for two to five minutes yelling at them to stop or cease. And at the moment that he started counting down was when Mr. Bennett broke free. Mr. Elias doesn't testify that Mr. Jones let him go or that there was a pause. The testimony is that it was very fast. Moments happened. Nobody, Mr. Jones at that time, didn't back away, didn't drop his weapon. In fact, it appears that everybody stood still in those moments until the shots rang out. There was very little time it occurred, and so very little time to expect perfect judgment for a person to then realize that the situation is calm enough. There is also a case law that decided that multiple shots isn't enough, that there are situations where multiple shots are justified. And in this case, Mr. Bennett fired once and Mr. Jones was still on his feet. He was woozy. According to Ms. Bias' testimony that he was woozy. It's unclear and it's not in the record that any weapon was dropped or that he had backed away. At that point, Mr. Bennett still believed that the incident was still ongoing. There wasn't any action undertaken. The Marine counting to five certainly gave him occasion to pause, and it gave him occasion to flee. And he could have fleed to safety, but it appears that he fleed in order to get a gun. And so that entire circumstance happened in a matter of seconds. And so that's a very important distinction in that you're asking or will be asking for Mr. Bennett to have had the sound mind at that moment to make that appropriate decision. The law doesn't require him to flee. He was well within his rights to be at the position that he was at, and Mr. Efrain Elias was still in the area where Mr. Jones had just been beating upon Mr. Bennett. And so it's our contention that he had the right to be there and that this time that elapsed, these moments after Mr. Bennett escaped, was insufficient for there to be a sufficient pause, a cooling period for Mr. Bennett to have engaged in alternate actions at that time. Now, if we can look at the factors that apply as far as in self-defense, they were all present in this case. There was force threatened against Mr. Bennett. That is very clear. It's clear that Mr. Bennett was not the aggressor and that the threat of harm was imminent. The threat was unlawful and that Mr. Bennett did believe that it occurred. But that belief also has to be reasonable for self-defense, correct? Correct. And if it's not reasonable, if all those factors are present that it's not reasonable, that would reduce it to second-degree murder, correct? Correct. And so we argue that if it was self-defense, and in return if it was an unreasonable belief, we'd be asking for a reduction to the second-degree murder on this count. As far as the second-degree murder goes, a little clarification on that. So there is the unreasonable belief and the sufficient provocation. The unreasonable belief as it would apply to Mr. Jones is what we would be asking for in that matter. And then as far as the serious provocation, we'd be asking if that would apply in reference to Ms. Bias. Normally because of the lack of clear evidence as to what number of shots were taken, that any action towards Ms. Bias after the conversation with Jones would have been sufficient provocation, the entire circumstances being taken into account. So there's only one shot that hit her. Correct. Okay. There's only one shot that hit her. It's unclear as to, like I said, the record doesn't make it clear how many shots were taken. And that's just, that matter is unclear whether it was two or three shots. And so the difference would be if there were three shots, that might change the analysis as to if there were two shots. What's the implication of all this? Excuse me? What's the implication of all of this? The implication as far as it regards Mr. Bennett's conviction? Yes. So the implication would be that Mr. Bennett was acting in self-defense, that this was not a matter that he should have been found guilty of the first-degree murder charge. There were sufficient factors here that justified his use of force. Such as? The attack from Mr. Jones onto Mr. Bennett. The use of a weapon, the, on top of the fact of the location that Mr. Bennett was at, an industrial park with a vehicle that wasn't fully operational, being then pinned and cornered by Mr. Jones. Mr. Jones was a clear aggressor. There was little reason or indication as to why he turned down that area, an industrial area found upon Mr. Bennett about five minutes later. The records don't indicate or it's not clear that he was following, but it was an industrial area where there was no police station nearby. And without. So it was the Buick versus the? Maserati. Maserati. Right. And so the Maserati had some damage to the front. And apparently the Buick was damaged. The rims and wheels were damaged. So it wouldn't have been a situation. Why does all of this escalate into something else? So it escalated at the point that Mr. Jones came upon Mr. Bennett's vehicle, went up to him, pinned him, and started to beat him about the body and the head. He pushed against his neck and pressed against him. Is that right? Mr. Jones did, yes. Why? Because of the accident? The record is unclear. There's some testimony that Mr. Jones was upset over the value of the car, how much the repairs were going to be. $70,000, I think, somewhere in that range. That is what the testimony was. There are some moments of interaction. Mr. Bennett fled the scene. And Mr. Jones came up behind him afterwards. That was where it escalated to the point that it didn't need to. After that interaction, during those approximately five minutes or so is when this all happened. And then it was only moments from when Mr. Bennett was able to flee until the shooting happened. It was a very quick, very rapidly changing situation. And it would be unreasonable to expect that in those moments that elapsed, Mr. Bennett would have had the ability to make a different decision given what he had just experienced. What do you mean by that? That he would have done something differently? I'm saying that our expectation to judge the actions and the idea of the moment isn't what's required. It's as long as it was reasonable belief that he needed to exercise first. Well, in this instance, the trial court, having heard the evidence, rejected your defendant's claim of self-defense because it specifically found, the trial court specifically found that the fight was over when the Marine, Militio, yelled at the parties to stop. He counted to five. They did stop. And the trial court's finding was that after that point, the defendant was no longer in immediate danger. If you'd like to have some time for your rebuttal, would you like to conclude at this time? Yes. So for the reasons I stated and the matters that are raised in the brief, we'll ask this court to reverse the conviction of first-degree murder as it applies to regarding to Jones. And the alternative, we'd be asking for that to be reduced to a second-degree charge, as well as a reduction in the charge of misbias to a Class I felony. Thank you. You'll have ten minutes for rebuttal. Thank you. Again, may it please the Court, I'm Assistant State's Attorney Tasha Marie Kelly. As counsel noted, there was a car accident. There was a physical altercation between Mr. Jones and the defendant in this case. But none of that legally justified the shooting of Charles Jones or Kathy Bias that took place here for the simple reason that, as the trial court observed, the physical altercation had ended before the shooting took place. Once Mr. Malesios started his countdown and the two broke free of each other, defendant had the choice at that time to leave the scene, to flee, to escape to a place of safety. But instead, what he chose to do was to go to the car, five to six car lengths away, where he had previously concealed the weapon, bend down, reach under, grab the gun, stand back up, and walk back towards the man that he had the physical altercation with. The testimony indicates that he was concealing the gun behind his back. As he approached, he was walking in an aggressive manner. He gets to Mr. Jones, who's standing there with his hands up at this point as the defendant pulls the gun out. He shoots him. He watches him fall, shoots him again in the head. And then, even worse, he walks to the car where... It was for both shots. He's standing for both shots. Isn't that the testimony? He doesn't fall at the time of the second shot, does he? The testimony of Kathy Bias is that... Oh, and everything you're quoting right now is her testimony, not Malesios' testimony. That's her description of what happened. It's actually a combination of both. Okay. Mr. Malesios does indicate that he believes that one of the shots took place when... He indicates there's one shot and that Mr. Jones... He believes that there's one shot of Mr. Jones. Correct, and that Mr. Jones is either falling at the point of the shot or he has already fallen. Wait, he's falling before the shot? Yeah, that he is... He has the... I'm sorry, the defendant has the gun pointed at him and that he falls to the ground and the shot. Then there's the shot. That doesn't really make sense, does it? His testimony on cross-examination is not entirely clear, Your Honor. Okay. In any event, we're sitting here with 20-20 hindsight, as was the trial judge saying, hey, it looks like it's broken up. I think the defendant's point is, from the defendant's point of view, it was all happening very fast. Hard to say whether the danger had passed. So I want to focus for a minute with you on whether he had an unreasonable belief. Let's assume that it wasn't reasonable, given what we see now, to have gotten a gun. You say that he's waived that, and I don't see why you say that. You say that the defendant has waived the argument on appeal in an unreasonable belief that he was acting in self-defense. That's what you say in your brief, and I read in his brief, and he clearly, it seems to me, makes that argument. So I want you to explain to me why you think that's waived. In looking over our brief again, I'm happy to address that argument here. Because you don't address it in the merits in your brief at all. So address it. As far as unreasonable belief in self-defense goes, his actions were, if you look at them as a whole, as to what happened during the course of the shooting, they weren't the actions of a man who was acting with an unreasonable belief in self-defense. After he grabs the gun, he doesn't approach Mr. Jones with the gun out, point it at him, stay away from me, stay away from my friend. He doesn't give Mr. Jones a chance to do anything. He sees Mr. Jones standing there at that point. The testimony, again, is that Mr. Jones's hands are up. There's no danger to the defendant at that point. Mr. Jones hasn't chased him as he went to get the gun. He just remained where he was. After the shooting takes place, defendant doesn't stay on the scene to contact the police. So he does turn himself in, ultimately. He ultimately turns himself in, but that's after Mr. Malescio makes multiple attempts to get him to turn in. He's wired, yeah. It's finally when he gets a lawyer and the lawyer brings him in to turn himself in. This isn't, you know, a few hours later he reports to the police station and says, I shot this man in self-defense. And the description of Mr. Jones having his hand up, is that in Mr. Malescio's testimony? Ms. Files. Oh, that's Ms. Files. What does Mr. Malescio say Mr. Jones is doing at that point? Mr. Malescio says he's not entirely sure what Mr. Jones is doing, but he does know that Mr. Jones never moves. He says that Mr. Jones never says anything to Mr. Malescio. He never approaches Mr. Malescio, never threatens Mr. Malescio. The last thing that I would say as far as unreasonable belief in self-defense goes, if this is a man who's acting with an unreasonable belief in self-defense, where does the shooting of Kathy Bias fit into that? This is a woman who hasn't physically attacked him at most. She's gone through his pockets to try to find out his identification, and she's fled in fear for her life to a car. She's sitting in the car trying to get the car to start so that she can get out of the area, and he shoots her. So you think that's relevant to his state of mind? I would say it is relevant to his state of mind, and it gives us a look into the motivation for the shooting, which is clearly, this is a revenge shooting. This is a man who's embarrassed that he's been beaten by a man who's larger than him, that he's been beaten in front of his friend, and he's upset, and he shoots the man for revenge, and then on top of that, he shoots the passenger in the car who's done absolutely nothing to him. So are you no longer taking the position that he's waived that argument on appeal? Yes, Your Honor, and I do apologize for the misstatement in our brief. The defendant initially, when this began, there's testimony they were, I don't know, exchanging blows or whatever, but with the keys and whatever, that the deceased drew blood from the defendant's head. Is that correct? That is correct. And later, when the defendant commits these shootings, was he still bleeding? I'm not entirely sure of the answer to that, and I don't want to answer incorrectly. Was there any evidence as to whether or not the defendant secured medical treatment for the bleeding? There was. The defendant did testify that he did not receive any medical treatment for his injuries. Proceed. Were there charges filed against people here? I'm sorry, Your Honor? Were there charges filed against people here from these altercations? Well, there was not, Your Honor. There were no charges filed against Ms. Byrus, obviously, because she wasn't a part, and Mr. Jones was deceased, so the only person who was charged was the defendant for the two shootings. If there's no further questions, Your Honor, we would ask you to affirm the defendant's conviction in this case, and as to the other issues, we would stand on our brief. Thank you. Thank you, Your Honor. Marla. Thank you. I would just like to address a few issues that were just raised. The first issue that I would like to address is the court determining that the confrontation had ended at the point that Mr. DeFranco was counting down. It's our contention that it had not ended. There were moments that have elapsed after that point, and there is nothing in the record to indicate that Mr. Jones had ceased being the aggressor, any affirmative action that was taken by Mr. Jones to remove himself from being the aggressor in the situation. The testimony indicates that Mr. Jones essentially stood there, still armed, didn't drop a weapon. And so the other part of the testimony that Ms. Bias gave about the hands up at that moment, which would indicate some more information towards the confrontation having ended, is unreliable. Ms. Bias was minimizing the actions of Mr. Jones throughout the entire time, and just moments before she stated that Mr. Jones had his hands up, testified that she was unaware as to whether Mr. Jones even saw Mr. Bennett coming up to him. Additionally, it doesn't indicate that his hands were above his head in a manner that would be submitting or acquiescing or not being the aggressor. But his hands up, when he still had a weapon in his hand, could very easily be seen as an aggressive position that Mr. Jones was still standing in at that time. Did Bennett say at any point that he was afraid that he would become the victim? Yes, he did. He said he was still scared. He said he feared for aggression being directed towards Mr. Efrain Melecio, and he also indicated that he was still fearing for himself at that time. So it was all self-motivated to protect himself? If that were the case, that would be sufficient. Who was he giving up? What was his concern about himself that may have involved other people and their desires as to what was occurring at this time? Are you referring to Mr. Jones? I'm sorry, could you rephrase the question? Go ahead. Okay. The state characterized this as a revenge shooting is the last point I will refer to or reference here. There's nothing in the record to indicate that that was what happened. There's no mention of Mr. Bennett showing hostility, anger towards the beating in a revenge fashion, and anger over having just been beaten by a man approximately three times his size. The other factor in there is that Ms. Ballas and Mr. Efrain Melecio all did observe Mr. Bennett bleeding profusely at the moment. Mr. Bennett was able to escape the grips of Mr. Jones. So it's uncontradicted that he was bleeding, he was wounded, and this was just moments before the shooting happened. This is not a case where there's revenge anywhere indicated here. It's not enough time for that to have occurred. For these reasons, we ask that you reverse this conviction. Thank you. Thank you. Thank you, counsel. Thank you to both counsels. Court is taking the matter under advisement. Court is adjourned.